on behalf of appellants. May it please the Court. I would like to reserve five minutes for my rebuttal, if that's acceptable. Keep track of the timer, all right? Very well. Thank you, Your Honor. This is another case in the district court in which the court decided material disputed facts in Grant and Defendant's summary judgment motion. There are essentially two issues, as I see it, in this case. The first issue is the issue of the stipulation. And the issue that relates to that that I think is the most salient is the voluntariness requirement under the rumory decision. Here, of course, is the tripartite requirement under rumory, that if there is a stipulation or a waiver entered into, that it be voluntary, that there be some proper prosecutorial purpose, and that it further the interests of the public. In this case, we were – essentially are stuck on the issue of voluntariness. There are material disputed facts as to whether or not Arthur, in signing this stipulation, did so voluntarily. The Court has disregarded and found some findings of facts which are clearly in dispute here. The rumory decision indicated that in the first prong of the three requirements, voluntariness, the Court must shift the burden of proof to the defendant, the cities. And the cities have a requirement to show evidence that all of the requirements are met, including voluntariness. In this case, there is evidence, certainly reasonable inferences can be drawn from the evidence presented, that none of the elements of the first prong of voluntariness were met. First of all, Arthur Carmona, 16 years old when he was placed in jail, at the time of his writ, which the Court had shown in OSC as to why the writ shouldn't be granted, had been in prison for two and a half years. He was presented with a stipulation by the cities 20 minutes before the hearing on the writ. Arthur Carmona is a special needs student who has both a cognitive processing disorder as well as a verbal processing disorder, set forth in the declaration of his special education teacher, Mathiasen. I don't want to short-circuit your argument on this, but just to let you know, I was pretty well persuaded by it. So then I tried to sort through all the other issues, and then I got stopped short when I got to Monell liability. So I'm interested to hear what evidence you think one can look to for customary policy on the two defendants. Now, with respect to the Monell requirements, in this case there are two ways to surmount the two Monell requirements establishing liability for the municipality. The first is establish some practice or custom or policy on the part of the cities for these unduly suggestive show-ups. And there are disputed material facts that were presented to the Court below about this factual issue. That is, is there some evidence that a reasonable juror could infer that some policy, custom, or practice existed? Well, there are three different ways to do that. There is, as we've attached in transcript, a 1993 show-up form that the City of Irvine uses for its police officers and which had been in effect five years before this arrest, which establishes the policy and practice that the police officers are to use for curbside show-ups. Okay. So I read that. We even had another curbside show-up case earlier this week, so I read the same thing earlier in the week as well. But when I read it, I don't see anything in there that suggests a custom or policy that would permit you either to do something that's inherently suggestive or that also gets you to a substantial risk of misidentification. I read it to basically say you can have one-on-one curbside show-ups. Is there anything more in there? Well, there isn't anything more in the form itself. The question is so let's take the form. Yes. We have to see if that's a piece of evidence that establishes a custom and policy to have show-ups that are unconstitutional. I think it's the form and the practice that the department actually engaged in. And the connection is. So let's take the form, and then do you have a practice that they engaged in? Yes. Other than this case? Yes. Sam Alivato, who is designated the spokesperson for the Irvine Police Department, had indicated in a number of different areas. First, he was quoted in a newspaper article after the arrest and conviction. Later, he confirmed in a deposition, two years later, when I deposed him, the following. He said that the method and practice of this type of curbside show-up was standard procedure, that they had engaged in such tactics in the past, that it was acceptable, and that there was no reason that they wouldn't do the same thing in the future. This is two years after the actual unduly suggestive. But he, I thought he said, well, I don't know if you can use him as a, you know, policymaking person, but I thought he basically says there isn't any policy. It was okay here, he thought, but he didn't know of any policy. Actually, he said in a number of different ways that this was, in fact, this particular show-up and identification was nothing more than a routine show-up in which they had used clothing or, in this case, a hat, like they had done routinely, I think, in this particular case. Now, I'm not going to read through the record. I'm not going to read through the record as words. I can read through the record or I can simply paraphrase. But I'm quoting from the deposition of Mr. Alivato, which is attached to the record. Just for reference purposes, it's pages 648, 649. This is whose deposition? This is Sam Alivato, who is the spokesperson for the Irvine Police Department. I'm sorry. I'll read from page 656. This is Mr. Alivato. Question. On that page, I'm referring to the newspaper article. Quote, we do these types of lineups routinely and it's perfectly acceptable. Is that what you said? Answer, yes. Question. What were you referring to when you said those types of lineups? Answer. I was talking about all types of lineups. Question. Were you talking about lineups where you have people put on jackets, hats, and different items of clothing? True. Answer. True. Question. And you said that's a perfectly acceptable practice, right? Answer. Correct. And it's done routinely. Routinely. True. Answer. Correct. So Mr. Alivato is designated a spokesperson for the police department. And in his deposition, he was asked, was he ever misquoted? His answer was no. Did he think carefully about the questions he was asked before he answered them? His answer was yes. Okay. What's unconstitutional about that policy? Well, a one-on-one show-up without the use of crime scene clothing, specific crime scene clothing, which is taken from the condition of a crime and placed on a suspect, is automatically suggestive. And I don't think that's in dispute. The experts, as we've attached the deposition to the transcript, agree that a one-on-one show-up is automatically suggestive. It becomes unduly suggestive when there is, in this case, a distinctive item of clothing used in the condition of a crime, a Lakers baseball cap with distinct coloring and writing, that is taken knowingly from the crime scene. Now, you say in this case you're distinguishing this case from what, you know, the general practice is. Well, what I'm doing, Judge Tachim, is I'm now distinguishing this particular method of an unduly suggestive show-up from one which is not unduly suggestive, but is merely automatically suggestive. But don't we have cases where the hat can go either way? I don't say the hat. I'd say a piece of clothing. Having a piece of clothing that comes from the commission of a crime or used during the commission of a crime put on somebody can be unconstitutional, but it's not necessarily unconstitutional. Would you agree with that? That's true. And there are probably half a dozen cases that are cited by the appellees in this – in their brief that talk about different instances where clothing or items from a commission of a crime were used in connection with suspects. However, in every one of those cases, which can be distinguished factually as well as other reasons, there is some nexus or connection between the item of clothing and the use in connection with the suspect. For example, there's one where a ski mask was used to be placed on a bank robber, but the bank robber was surveilled from the time he left the bank until they apprehended him minutes later. There was a nexus or a connection. There are cases where a wallet was found on someone who had just committed a robbery. It was in his pocket, so they used the wallet in identifying the suspect. There was a case in which clothing, coats and I believe a sweater, were used in show-ups, these cases that were cited in the brief. The connection with those cases was, in one instance, the getaway car, which was seized, had the clothing inside of it that the suspects had just discarded. They were caught right outside the car. In another case, the suspects had discarded their clothing by an incinerator where they were found. In other words, there is always a nexus or a connection between the suspect and the crime scene clothing. There isn't one here. Mr. Patton, I'm persuaded that the police in this case, this was not good police work. But where is the evidence for the pattern of practice that Irvine and Costa Mesa, as a matter of policy and practice, want unduly suggestive curbside lineups? I don't think that we'll find anywhere in the record, nor do I think that there will ever be an admission by anyone from either of the police departments that they want unduly suggestive show-ups. The question is, is there some factual dispute that we have presented, some material factual dispute from which a reasonable trier of fact can infer that there indeed was some policy. Do you have other evidence of the Costa Mesa Police Department engaging in unduly suggestive lineups? I do. I have admissions. I have Mr. Alivato, who is – Well, Mr. Alivato has spoken. I'm talking about very specific cases. For example, do you have other 1983 actions? Do you have other cases that were dismissed, other prisoners released on habeas corpus, as Mr. Carmona was, that would tend to show that this has been going on for a long time, that the police department was very much aware that it was behaving badly and probably unconstitutionally, and it continued to do so? We don't have any prior cases. There fortunately have not been any other cases like Mr. Carmona. But what we do have are facts presented below which show admissions by the police department that this is a practice that they deem to be not only routine. Well, I mean, you have to be more specific when you say this. What? Taking a piece of clothing from the crime scene, having the victim put it on, and then going to one person and show up? Is that what you mean by this? What do you mean by this? Well, what I'm talking about is the general description in these statements. The questions presented to Mr. Alivato both in the newspaper article and in his deposition were this specific case. And I asked him whether or not in this particular case – When you say this case, you're not talking about our case.  In Mr. Carmona's case, the use of a hat in this case taken from the commission of a crime and placed on Mr. Carmona's head without any connection or nexus whatsoever, if this was routine practice and he testified in his deposition as well as defended in the newspaper article, it indeed is. Now, he did not cite any other cases in which they had done exactly the same thing, but he said as a spokesperson for the department, not only is it routine and do we use clothing in hats in other situations, but we will do it again in the future. Okay. But that's different. You see, you just told me that putting a piece of clothing on a defendant is not necessarily unconstitutional, but what makes it so here is that you take this piece of clothing that had no connection or no link. But that's not – even if we accept this, Mr. Alivato's position to even be able to make a statement on policy, he never gives an opinion on the circumstance that you're asking us to look at, does he? Well, there are two questions the Court's asked. First of all, Mr. Alivato, and maybe I've somehow misspoken, but I'm not arguing that Mr. Alivato is a policymaker within the department. No, I understand. He's simply a spokesperson who can relay their policy, who can speak for the department. He's not ratifying. He's just saying this is the policy. This is our policy. And I'm the person who's designated to tell you what it is. Right. So we'll take that. He could do that. Okay. And the follow-up question the Court had was whether or not he has criticized or he has adopted or somehow indicated that this particular instance was policy. Is that the Court's question? Well, this particular incident, with enough specificity that what we're talking about and what you're complaining about is the absence of the link between the hat and the person being shown up on the crime scene. In Mr. Alivato's deposition, I asked him in a number of different ways about this specific instance. And I asked him if in this case, placing the hat from the crime scene, used in the commission of crime, on Mr. Carmona's head. After a witness, Mr. Samad, who couldn't identify him, and having no connection at all between Mr. Carmona and the hat, if that itself was acceptable practice and procedure, and his answer was yes, it was and it is. Just point me to which of his statements say that. This would be page 648, 649 of the record, beginning on page 648, line 25. Okay. The question is, question. So as a spokesperson for the Irvine Police Department, when you were talking to these reporters in August of 2000 about the identification of Arthur Carmona in a field lineup, you were telling them essentially that placing the cap on Arthur Carmona's head in a field lineup to identify him was appropriate police procedure, true? Answer, no. Question, what were you telling them? Answer, I said acceptable. And then he goes on, without belaboring the record, I asked him in other ways if in this case there was anything that would prevent them from doing it in the future or if it was routine. He answered both questions affirmatively. One, it is appropriate procedure for the future, and two, it's routine because they often place clothing, including hats, on individuals during these show-ups. What about his answer on 649, page 22? Line 22 says, I would say that it's not policy. Well, that's – I think that's a strategic answer. The question is, if Mr. Alivato says it's not, quote, policy, but he goes on to say that it's acceptable practice on the next page, and he says before that that it's not, the question is, could a reasonable trier of fact conclude that acceptable practice and procedure are really a policy? And I think the answer is certainly that's what a trier of fact could decide in this case. Mr. Alivato was smart enough, as a spokesperson for having been so ten years when I took his deposition, he knew that the word procedure was a magical term of art here. And when he said it was the practice and it was the custom and it was acceptable procedure, he knew that that's what it was, which, in fact, is a policy. You're down to less than three minutes. Then I will step down. Thank you. Good morning, Your Honors. May it please the Court. My name is Lois Boback, and I'm representing the cities of Irvine and the city of Costa Mesa this morning. I think that the primary issue, obviously, with regard to the identification is whether or not it was an acceptable practice to put a hat on Mr. Carmona's head during the field show-up. I'd like to break that down in terms of policy, practice and custom between the city of Costa Mesa and the city of Irvine, because one city cannot be liable for the actions of another city. In order to establish liability, Mr. Carmona, I represent both cities, Your Honor. Mr. Carmona has to establish a policy, practice and custom of both Costa Mesa and Irvine in order to establish liability against both of them. In this case, there was no effort in the moving papers at all, in the opening brief, to establish a policy, practice or custom of the city of Costa Mesa. I would submit that the appellants waived any contention that they suffered any constitutional violation as a result of any allegedly unconstitutional policy of the city of Costa Mesa, because there simply was no evidence whatsoever in the opening brief. It wasn't until the reply brief, after we pointed out in our appellee's brief, it wasn't until the reply brief that Mr. Carmona made any effort whatsoever to suggest some evidentiary basis for a Costa Mesa policy, practice or custom. I think that's a little too late and a little too little evidence. It's not fair to a responding party to have to wait until oral arguments respond to arguments made for the first time. But nevertheless, I will address the few issues that are raised with regard to Costa Mesa. There are basically three pieces of evidence that Carmona cites to in support of an alleged policy, unconstitutional policy of the city of Costa Mesa, and that is that a Costa Mesa officer allegedly brought the cap from the location where it was the second robber's car, the getaway car, to the scene of the show-up, and actually placed the cap on Mr. Carmona's head. Assuming, for the sake of argument, which I'm not willing to concede, that that could be a constitutional violation, there's no evidence whatsoever that that is a policy, practice or custom of the city of Costa Mesa. It's just one person saying that in this case, one municipal officer brought a piece of evidence from one location and put it on somebody's head. It's not policy practice. It's not evidence of a policy, practice or custom. The law is well established that a single action by a non-policymaker cannot establish policy. The second piece of evidence that Mr. Carmona relies on is the testimony of his own expert, who said that he, quote, assumed, end quote, that Costa Mesa had a policy because evidence not in our record suggested to him that officers had admitted that they were acting in compliance with Costa Mesa policy. The evidence upon which the expert relied is not a part of the record. The opinion of an expert is not a part of the record. Scalia, it doesn't have to be, does it? Yes, it does have to be. Otherwise, it's just his opinion based upon information that we have no knowledge of. You can't just put an expert on the stand and say, okay, based on everything I've read, here's what happened. Mr. Carmona was pulled over. He was brought over to this site. A cap was put on his head. And all of these officers did all of these various things and they all made all these various admissions. You have to bring the officers in to say what happened. You have to bring Mr. Carmona to come in and say what happened. The expert can testify, perhaps draw legal conclusions about what the effect of those actions are, but he can't testify to the underlying facts. Those facts have to be premised on evidence. Otherwise, his opinion is just that, unsubstantiated opinion. But in any event, he can't testify to the underlying facts. As much as an assumption. There's just an assumption. Because if he had an opinion, if he had actually expressed a clear opinion under the rules of evidence, you wouldn't necessarily have all the underlying evidence in the record, correct? Well, I think you would have to have, you would be able to challenge his opinions by referencing the underlying evidence. And in this case, the underlying evidence isn't there. But in this case, he didn't, as you correctly note, Your Honor, he didn't make an – he didn't express an opinion. He expressed an assumption based upon the things that he had read. The things that he read that led him to that assumption are not in the record. So we don't know the accuracy of them. But again, even if they were, all they are are statements of individual officers who are not policymakers and who are not qualified to establish policy on the part of the City of Costa Mesa. Mr. Carmona points to absolutely no evidence in the record, other than those two items, that purportedly represent a policy, practice, or custom of the City of Costa Mesa of encouraging or allowing its officers to engage in unduly suggestive field show-up practices. So I would submit that summary judgment was properly granted on behalf of the City of Costa Mesa. With regard to Irvine, the evidence, Mr. Carmona points to the admonition field card, which I think shows a policy that is – that clearly meets constitutional standards. The field admonition card advises witnesses that they are under no obligation to make an identification. In fact, it says that twice. It twice tells people coming out to do a field identification that it's just as important to eliminate an innocent person as it is to identify a guilty party. It tells the people that they're not – that the person that they're going to be viewing may not have been the person who committed the crime. It tells them that if a detainee happens to be in handcuffs, they shouldn't draw any adverse conclusions from that. It tells them that they shouldn't talk to anybody on the scene. Those – those criteria all meet definitive constitutional standards, and there's nothing unconstitutional about that policy. With regard to Lieutenant Alivado's testimony, I think, number one, that a lot of the comments – a lot of the testimony that Mr. Carmona relies on is taken out of context, and I think it's important to put that into context. When Mr. Alivado testified that he thought that the specific circumstances involving Mr. Carmona were appropriate, this is what he said. Give us a page, please. At page – volume 3 of the record, page 647, beginning at line 7. And based upon your understanding of the circumstances involved in the field lineup with Arthur Carmona, do you believe that it was appropriate to place the cap on his head? Answer, yes. Question, and this is important. And why do you believe that that's appropriate? Answer. My understanding that there had already been some identification of the suspect and there had already been somewhat of an identification by a particular witness. I don't know who that person is. And the hat was placed on Carmona's head in order to further assist that witness in making an identification or eliminate him as a suspect in the robbery. So what Mr. Alivado – Mr. Alivado was talking about at that point was the specific circumstances surrounding the use of the cap with Mr. – with Mr. Carmona, not a more general policy or practice of the city of Costa Mesa. And when you look at the evidence surrounding the use of the cap, I would submit that it was not unduly suggestive. Three witnesses – there were about seven witnesses to the Juice Club robbery. Only three of them were brought out in the field for show-ups. They were each shown three different detainees, three different individuals who were being detained as possible suspects. None of the three identified the first two individuals. They all said that's not him. The first two, when they saw Mr. Carmona, said, I don't think that's him, I can't make a positive identification. The third individual, as soon as he saw Mr. Carmona, said, that's him. And the police officer said, take your time, make sure you've got a good identification, why don't you get out of the car, get a little bit closer and see whether or not you still agree that that's him. The witness gets out of the car, takes a closer look at Mr. Carmona and said, yes, that's him. Only then, after he had already positively identified Mr. Carmona twice, was the Lakers cap put on his head, and then the witness again confirmed that that was Mr. Carmona. If these circumstances were so unduly suggestive, one would think that all three of the witnesses would have said, as soon as they saw the distinctive Lakers cap, you know what, that looks like him, I think that is him. But that didn't happen. Only one of them, only one of the three witnesses to the Juice Bar robbery that went out for a field show-up identified Mr. Carmona. The other two were unable to, with or without the hat. And the one who identified him identified him twice without the hat before confirming his identification with the hat. I think that under those circumstances, it would be very difficult to conclude that the identification, that the procedures that led to the identification were so unduly suggestive that there was a substantial, substantial likelihood that it led to a false identification. I think it's also important to note that Mr. Carmona was tried and convicted for two robberies. The Denny's robbery had nothing to do with the witnesses from the Juice Bar robbery. There's no evidence in the record to suggest that there was some confusion based upon the one field show-up identification that somehow influenced the witnesses to the Denny's robbery. They picked Mr. Carmona out of a photo lineup, and there's no challenge to the validity of the photo lineup. So there was substantial other evidence in the record, other witnesses who identified him in other ways, that I think strongly leads to the conclusion that this process was not unduly suggestive. The other point with regard to Mr. — two other points with regard to Lieutenant Aliveto's testimony, and that is, number one, there's no evidence in the record that he is a policymaker for the city of Costa Mesa — pardon me, for the city of Rivine. So he's not capable of establishing policy. Number two, his deposition testimony, I think, makes it pretty clear that he was not talking about field show-ups specifically, but talking about lineups more generally, including lineups conducted in the jail, beginning at page 657 of his — let me back up just a moment. Counsel asked the witness during his deposition whether or not he was aware of any other instances where articles of clothing had been used in field show-ups. And the witness said, no, he was not. He wasn't aware of any specific instance before Mr. Carmona's case where — where articles of clothing had been placed on a suspect's head, and he wasn't — he wasn't aware of anything that occurred after that. So there's no history, there's no pattern of use of clothing by Irvine police officers that could somehow be ratified by Irvine officials with policymaking authority. With regard to the actual use of clothing in lineups more generally, when they were talking about the newspaper articles, which are inadmissible here, say, the lieutenant testified, question, prior to — beginning on page 658, line 9, prior to Arthur Carmona's case in February of 98, when he was arrested, were you aware of any other instances involving the Irvine police department where caps or hats were placed on suspects' heads in a field lineup to assist witnesses in identifying them? Answer, I can't recall specifically, no. And question, do you think Arthur Carmona's case was the first case that you are aware of in which the Irvine police department placed a cap on the suspect's head in the field lineup? Answer, I don't know. Question, well, how about jackets? Are you aware of any jackets that have been placed on people in the field — in field lineups prior to Arthur Carmona's case in February of 98? Answer, in field lineups, no. Question, so when you said that that was an acceptable practice to have people put on jackets and hats and different items of clothing, what were you referring to? Answer, in lineups, question mark. What kind of lineups? Answer, in the jail. So he's clearly talking about a much broader category of lineups than field showups. And I think it's unfair to extrapolate from that exchange in the deposition that he is testifying to a broad and well-established Irvine policy, practice, or custom of using articles of clothing in the field. I'll conclude — well, I'll conclude with regard to the evidence that was presented in the evidence of an unconstitutional policy, practice, or custom, simply by pointing out that evidence that the city — that it's okay for city officers to engage in eyewitness identification techniques that are constitutionally valid, that are not per se unconstitutional, is not an unconstitutional policy, practice, or custom. There has to be some evidence that the city had a policy, practice, or custom of engaging in unconstitutionally, unduly suggestive witness identifications, which isn't the case. There's no such evidence in this case. I think that there is also no evidence of a causal connection between any city policy and the alleged violation of Mr. Carmona's rights. I think that the Court's decision in Smitty v. Barney, which indicates that the independent decision by a prosecutor to pursue criminal charges cuts off the chain of causation between pre-prosecution events and post-prosecution, or the decision to prosecute things that happen beyond that, applies with equal force to municipalities. Carmona, I think, would argue that Smitty does not apply to municipalities, and he cites a footnote in the Smitty 1 decision where the Court simply referenced the fact that the Smitty complaint was filed before the U.S. Supreme Court issued its decision in Monell, and it pointed out that Smitty sought only injunctive relief from the city and that perhaps they would have sought damages had Monell been decided before the complaint was filed. There's certainly no reason to conclude that the Court would have found that the independent decision of the prosecutor to pursue criminal charges doesn't cut off municipal liability as well as individual liability if the municipal liability is premised upon a policy, practice, or custom that allowed the officers who may be arrested to do something. With regard to the stipulation, I would respectfully disagree with the Court. I think that there is substantial evidence that the stipulation was voluntary. Mr. Carmona was represented by counsel. He admitted on the record that his attorney always, always explained everything to him, that whenever he didn't understand something, his attorney explained it to him so that he would understand it. There's no evidence of subjective involuntariness. Mr. Carmona's own declaration establishes that he willingly signed the stipulation because he wanted to get out of jail. There's nothing, no constitutional mandate or prohibition on jailed inmates giving up constitutional rights. In fact, I would submit that every day jailed constitutional inmates waive very important constitutional rights. The stipulation is not invalid or otherwise involuntary because it was drafted by the district attorney. It was the evidence establishes that the stipulation was negotiated between the district attorney and Mr. Carmona's attorney before it was presented to Mr. Carmona. In fact, Mr. Carmona, through his attorney, asked for and got an additional provision added into the stipulation. There's no evidence of any prosecutorial misconduct with regard to the stipulation. Mr. Pair's declaration establishes that there was no threat of additional charges should Mr. Carmona refuse to sign the stipulation. There was no threat of increased jail time. There were no time constraints put on Mr. Carmona by the district attorney. Obviously, there were time constraints imposed by the pending hearing for the petition for a tedious corpus, but the district attorney didn't do anything that put additional time constraints on Mr. Carmona. Mr. Patten mentioned in his presentation that the cities of Irvine and Costa Mesa presented Mr. Carmona with the stipulation 20 minutes before the hearing on the writ of habeas corpus. That's not an accurate statement. There's no evidence in the record that the cities of Irvine or Costa Mesa had anything to do with the stipulation. Mr. Pair, the district attorney, and Mr. Fabricant, Mr. Carmona's attorney down below, both submitted declarations in connection with the summary judgment. Neither said anything that suggested in any way, shape, or form that the city of Costa Mesa or the city of Irvine had anything to do with the stipulation. In fact, there's nothing in the record to even suggest that either city knew that the stipulation was being contemplated. The stipulation was signed two and a half years after Mr. Carmona was convicted, two and a half years after the city of Irvine or the city of Costa Mesa had anything to do with the case. It's extremely difficult, I think, to conclude from that circumstance that there was any coercive effort by the city of Costa Mesa or the city of Irvine to put pressure on Mr. Carmona to sign this stipulation and waive important rights against the cities. When the cities weren't involved in that discussion at all and when he had already been convicted of a crime and was already serving time. I guess I would conclude by saying that in considering the validity of a stipulation waiving a right to pursue a civil rights claim, the Court can and should consider the validity of the underlying city civil rights action. And I think in this case, there is very questionable the claims asserted against the city of Costa Mesa and the city of Irvine are very questionable. There is no evidence of a municipal policy, practice or custom that was the cause in fact of a constitutional deprivation suffered by Mr. Carmona. Therefore, he didn't really give anything of value up when he signed the stipulation, got out of jail, had the criminal charges against him dismissed. And had his conviction vacated. He got everything that he wanted out of the stipulation. And I'm sure that he's very happy to be out of jail now, and I would be very surprised if he would agree, if the stipulation would set aside that he would go back to jail and have the end and wait for the hearing on a petition for writ of habeas corpus. With that, Your Honors, I will submit, and thank you very much for your time. Roberts. Thank you, Mr. Alvarado. Let me just pick up with Mr. Alvarado. Again, we're not in any way arguing that he is a policymaker. He has simply been deemed as a spokesperson for the Department and can speak as to their policy. There was one, this statement of the record, and it's probably because Mr. Alvarado either spoke or misspoke a number of different ways in his deposition. Counsel has indicated that Mr. Alvarado was referring to jail lineups when they placed hats and clothing routinely. But in page 648 and 649 of the record, the question is, so as a spokesperson for the Irvine Police Department, when you were talking to these reporters in August of 2000 about the identification of Arthur Carmona in a field lineup, you were telling them essentially that placing the cap on Arthur Carmona's head in a field lineup to identify him was appropriate police procedure. True? Answer, no. What were you telling them? Answer, I said acceptable. There are at least three other questions and answers that refer to field lineups and the placement of clothing and hats. There was the implication that Mr. Carmona was identified immediately when he was seen by the witnesses at the field show up. He was not. In fact, there are disputed facts about whether or not Mr. Abdul Samad, who was the only of four people who identified Mr. Carmona when he was brought to the scene and only after the hat was placed on him. Mr. Carmona testified in his deposition, and I'm reading it now, page 602 of the record. Question, you told me that you stood up and turned around for Mr. Waleed, and then you saw Mr. Waleed shaking his head no. Correct? Answer, yes. Question, did they ask you or did you sit back down on the curb at that point? Yeah, I sat back down on the curb. Question, how long did you remain on the curb for a little bit? What happened then? Well, the officer arrived and I seen a hat getting passed around, and then they tried to put it on me, and I told them it wasn't mine, don't put it on me. But they put it on me anyway and had me look left, right, forward, backwards to the witnesses. And that's when they, I can see Waleed saying, or I can see him shaking his head yes. And then in the truck I can see somebody still going no, shaking their head no. There is a disputed fact. Mr. Carmona testified that Mr. Waleed did not identify him. In fact, said shaking his head no, it was not the person he saw at the robbery minutes before. But once the hat taken from the crime scene was placed on his head, that's when Mr. Waleed identified him for the first time. That is a disputed material fact in this case. Whether or not in this case the unduly suggestive show-up was indeed unduly suggestive. Mr. Waleed testified at trial that he was 80 percent sure that Mr. Carmona was the suspect. But when the hat was put on him, he was 100 percent sure. That testimony indicates clearly he was not sure that Mr. Carmona was a suspect. What he said and what he wrote in his statement later was he identified the hat, because he recognized the colors and he recognized the writing. The reason that Mr. Carmona was identified was because this particular hat used in the commission of the crime was distinctive writing and coloring was placed on his head. Kennedy, you're past your time to continue. Thank you. Thank you. We thank both counsel. This case is submitted for decision. Last case on the calendar for the day and for the week. So we'll stand in adjournment.
judges: Tashima, McKeown, Bybee